# Illinois Official Reports

## Appellate Court

---

### *People v. Torres*, 2019 IL App (1st) 151276

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MIGUEL TORRES, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-15-1276 |
| Filed | December 20, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-17776; the Hon. Gregory Ginex, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Stephanie T. Puente, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Lisanne P. Pugliese, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.<br>Justice Walker concurred in the judgment and opinion.<br>Presiding Justice Griffin dissented, with opinion. |

**OPINION**

¶ 1 On the night of October 2, 2011, Miguel Torres and Roberto Vargas approached a car where Jose Salgado and Angel Cintron were sitting, and Mr. Torres fired two shots toward Mr. Salgado, who was in the driver's seat of the car. Mr. Torres was convicted of attempted first degree murder while personally discharging a firearm (720 ILCS 5/8-4(a) (West 2010); 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2010)) and aggravated discharge of a firearm in the direction of a vehicle that Mr. Torres knew or reasonably should have known was occupied by a person, specifically Mr. Cintron (720 ILCS 5/24-1.2(a)(2) (West 2010)).

¶ 2 At trial, Roberto testified against Mr. Torres. Roberto acknowledged that he had also played a role in this shooting and told the jury that he had pled guilty in juvenile court to attempted first degree murder (*id.* § 8-4(a)) and to aggravated battery (*id.* § 12-3.05(a)). This testimony was not true. Roberto pled guilty only to aggravated battery—not to attempted first degree murder. The testimony went uncorrected by the State, despite defense counsel expressing concern that the jury might infer from that plea that Mr. Torres was also guilty of attempted murder, thereby undermining his only defense, which was that he never had the specific intent to kill someone, a necessary element for an attempted murder conviction.

¶ 3 Mr. Torres appeals his convictions on three bases: (1) the State's use of and failure to correct Roberto's false testimony deprived him of his right to due process of law; (2) his trial counsel was ineffective; and (3) his conviction for aggravated discharge of a firearm in the direction of a vehicle he knew or reasonably should have known was occupied by a person violated the one-act, one-crime rule.

¶ 4 For the following reasons, we reverse Mr. Torres's conviction for attempted first degree murder and remand for a new trial on that charge. We find that Roberto's false testimony that he pled guilty to attempted first degree murder was not harmless error in this case. This reversal moots Mr. Torres's argument under the one-act, one-crime doctrine. Finally, as to the remaining charges against him, we reject Mr. Torres's claim that he received ineffective assistance of counsel.

¶ 5                                              I. BACKGROUND

¶ 6 In October 2011, Linda Torres-Jurado placed a telephone call to her 16-year-old son, Roberto, and told him to find Miguel Torres and also to locate a gun so that the two of them could scare Ruben Lopez. Linda had hired Mr. Lopez to drive a truck full of heroin from Mexico to Chicago, but Mr. Lopez had not made the delivery or contacted Linda. Linda was receiving threats against herself and her family in Mexico and was desperate to find Mr. Lopez and recover the lost cargo.

¶ 7 Roberto did as he was told; on October 2, 2011, he secured a handgun from a local gang member, and then he and Mr. Torres walked to Linda's house. Along the walk, they picked up Roberto's 15-year-old girlfriend, Jesenia Carmona. When these three arrived at Linda's house, everyone got into her car, and they drove off in search of Ruben Lopez.

¶ 8 Mr. Lopez turned out to be an informant who was actively cooperating with local and federal law enforcement in an investigation directed at Linda's drug trafficking activities. Shortly after the shooting in this case, Linda and her son were detained by agents of the United

States Drug Enforcement Administration, and soon after that, Mr. Torres was arrested by Cicero police officers.

¶ 9   While in custody, Mr. Torres waived his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and gave a detailed written statement, confessing to having shot at the driver of the car in order to scare him, after Linda had incorrectly identified the driver to him as being Ruben Lopez's brother, Beto. Mr. Torres said in his statement that Linda had told him to scare Beto so that Beto would tell him where Ruben was. As it turned out, the person that Mr. Torres shot was not Beto, but Mr. Lopez's neighbor, Jose Salgado, who had no connection to Ruben Lopez or to Linda's missing drugs. Angel Cintron was in the car with Mr. Salgado and took the wheel after the shots were fired to drive Mr. Salgado to the hospital.

¶ 10   Mr. Torres, who was 20 years old at the time, was charged with (1) attempted first degree murder, (2) personally discharging a firearm during the commission of attempted first degree murder, (3) aggravated battery, (4) two counts of aggravated discharge of a firearm in the direction of another person, and (5) two counts of aggravated discharge of a firearm in the direction of a vehicle that Mr. Torres knew or reasonably should have known to be occupied by a person.

¶ 11   Roberto, who was 16 years old, was charged as a juvenile with 10 offenses, including aggravated battery and attempted first degree murder. On June 20, 2013, Roberto pled guilty to a single offense: aggravated battery. The State dismissed the remaining nine charges against him, and Roberto received a sentence of five years' probation.

¶ 12   On October 28, 2014, Mr. Torres's case proceeded to a jury trial. During a single day of testimony, the State called five witnesses: Jose Salgado, Angel Cintron, Roberto Vargas, Jesenia Carmona, and Detective David Leuzzi. Mr. Torres presented no witnesses.

¶ 13   Jose Salgado testified that, in October 2011, he lived next door to Ruben Lopez. They drove similar cars: Mr. Lopez drove a white Crown Victoria and Mr. Salgado drove a white Lincoln Town Car. On October 2, 2011, at around 7:30 p.m., Mr. Salgado and his friend, Angel Cintron, decided to get into Mr. Salgado's car to go get something to eat. Mr. Salgado drove, and Mr. Cintron sat in the front passenger seat. They backed out of a parking spot and started to drive down the alley behind Mr. Salgado's apartment when Mr. Torres waved them down. Mr. Salgado slowed to a stop and rolled down his window.

¶ 14   Mr. Torres stood an arm's length away and asked, "where you from." Mr. Salgado answered, "Chicago." Mr. Torres repeated the question. Mr. Salgado pointed to his apartment. Mr. Salgado then heard gunshots and "saw the flashes" from Mr. Torres's gun. Mr. Salgado's left arm went limp, and he felt a "burning sensation" in his chest. He attempted to drive to his parent's house because he believed he was "going to die." Mr. Salgado could not drive, so Mr. Cintron took the wheel and drove to a hospital where Mr. Salgado was treated for two gunshot wounds, one to his chest and one to his arm. Mr. Salgado survived the shooting, and the bullets were removed from his body six months later.

¶ 15   Angel Cintron gave a similar account. He testified that on the night of October 2, 2011, he and Mr. Salgado left the apartment to go to a Chinese buffet. He got into the front-passenger side of Mr. Salgado's car, and they drove down the alley behind his apartment when Mr. Torres flagged them down. Mr. Torres approached the driver's-side door, got close, and twice asked Mr. Salgado where he was from. Mr. Cintron noticed another man walking near the car on the passenger side, saw Mr. Torres and the man nod at each other, and watched as Mr. Torres

pulled a handgun from his sweatshirt pocket and shot Mr. Salgado "two or three times." Mr. Cintron drove Mr. Salgado to the hospital and called the police.

¶ 16 Roberto testified that he received a call from his mother in October 2011 and was directed to find Mr. Torres and go look for a gun. Roberto found Mr. Torres and the two of them got a handgun from a local member of the Gangster Disciples. It was black and silver in color and loaded. Roberto and Mr. Torres walked to Roberto's mother's house and picked up Roberto's 15-year-old girlfriend, Jesenia Carmona, along the way. When they arrived at Linda's house, everyone got into her gold Ford Explorer, and they went to find Mr. Lopez. Linda drove, Jesenia sat in the front seat, and Mr. Torres and Roberto sat in the back.

¶ 17 While in the car, Linda instructed Roberto to give the handgun to Mr. Torres. Roberto complied. She told them to "get one of [Mr. Lopez's] family members or scare one of his family members, shoot up the house, find one of his family members." Roberto translated his mother's instructions from Spanish to English for Mr. Torres, who was not fluent in Spanish. Linda drove by Mr. Lopez's apartment and pointed it out to Roberto and Mr. Torres. She then purchased some beer for them to drink. Roberto remembered doing some cocaine as well. When Jesenia got hungry, they all ate at McDonald's.

¶ 18 When it was dark, Linda dropped off her son and Mr. Torres in the alley behind Mr. Lopez's apartment. Roberto testified that as he walked down the alley, he saw Mr. Torres wave at a car. The car stopped, and Roberto saw Mr. Torres fire the handgun two times into the driver-side window. Roberto and Mr. Torres ran away, and Linda picked them up.

¶ 19 As they drove away from the scene, Roberto heard Mr. Torres say, "I shot him. I shot him in the head and chest, and I better get something for it." Linda replied, "good," and told Mr. Torres to clean and remove the fingerprints from the gun. Mr. Torres called Roberto the next day, asking for money.

¶ 20 Roberto admitted that he was arrested after the shooting and taken to the Cicero Police Department, where he waived his *Miranda* rights and told the police what happened the day of the shooting. The State then questioned Roberto about his guilty plea in juvenile court. The State asked, "on June 20th, 2013, in case number 11 JD 4268, you pled guilty in Juvenile Court to attempt murder and aggravated battery; is that correct?" Roberto answered, "Yes." The prosecutor continued, "[a]nd you currently are serving five years['] probation; is that correct?" He answered, "Yes." Roberto confirmed that this guilty plea was for his "involvement in the shooting of Jose Salgado and into the vehicle that Angel Cintron was seated."

¶ 21 However, Roberto *did not* plead guilty in juvenile court to the offense of attempted murder. The docket sheet of Roberto's plea in juvenile court, which Mr. Torres provided to this court in a supplemental record, makes clear that Roberto only pled guilty to aggravated battery and that the charge of attempted murder and a number of other charges were nol-prossed. The State, which had asked Roberto to affirm that he pled guilty to attempted murder, never corrected this false testimony.

¶ 22 Roberto's girlfriend, Jesenia Carmona, took the stand and testified that she sat in the front seat of Linda's car on the night of October 2, 2011, and overheard Mr. Torres say that "he shot the dude in the head and in the body." She also heard Mr. Torres say that the gun "got stuck."

¶ 23 The State called, as its last witness, Detective David Leuzzi, who interviewed Mr. Torres following his arrest. Detective Leuzzi testified that he read Mr. Torres his *Miranda* rights and that after Mr. Torres signed and initialed a preprinted *Miranda* form, he confessed to shooting

- 4 -

Mr. Salgado. Mr. Torres was interviewed a second time and at a different location by Detective Leuzzi and Assistant State's Attorney (ASA) Tom Sianis. Mr. Torres waived his *Miranda* rights and gave a written statement, which ASA Sianis typed out. Detective Leuzzi read Mr. Torres's written confession aloud to the jury. According to the statement, Mr. Torres told the police that Linda had told him her family was in trouble and that he had to shoot Ruben (Lopez) or scare Mr. Lopez's family and then told him to shoot Mr. Salgado, whom she identified to him as Ruben Lopez's brother, Beto, "so that he could tell [Mr. Torres] where Ruben was at."

¶ 24 The State rested its case, and Mr. Torres moved for a directed verdict. The motion was denied. Mr. Torres rested without presenting any evidence.

¶ 25 At the jury instruction conference, defense counsel told the trial court he was surprised to learn that Roberto had pled guilty to attempted murder and proffered an instruction that he argued was necessary so that the jury would not "infer [Roberto's] guilty plea [was Mr. Torres]'s, especially where one of the key issues in the case [was Mr. Torres]'s intent on the attempt murder."

¶ 26 The trial court denied defense counsel's request and instead gave a more general instruction regarding accomplice testimony. See Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2014). The ASA pointed out that it had notified the defense that it intended to introduce Roberto's guilty plea at Mr. Torres's trial, but the ASA did not notify either the court or defense counsel at that time or any other time that Roberto had *not* pled guilty to attempted murder, that he had pled guilty only to aggravated battery, or that the attempted murder charges had in fact been dropped.

¶ 27 Mr. Torres's case proceeded to closing argument, and the State emphasized the fact that Mr. Torres had shot Mr. Salgado twice at close range. Defense counsel delivered a meandering closing argument that began with reflections upon his early years as a law student. He discussed his experience reading a case about the "Small Birds Act in Canada" and explained how it taught him to "think legally," *i.e.*, that sometimes one must focus on the technical requirements of the law, rather than what a layperson might instead presume the law to be. Defense counsel then asked the jury to think legally and find that the State failed to prove that Mr. Torres had the specific intent to kill Mr. Salgado beyond a reasonable doubt. The thrust of the closing argument was the following: "Every witness you heard from, every witness talked about that the intent was to scare, scare, not kill." After touching on both the ratification of the United States Constitution in 1787 and the Wendy's "Where's the Beef" commercial, defense counsel concluded by asking the jury to find Mr. Torres not guilty of attempted first degree murder.

¶ 28 The jury deliberated and found Mr. Torres guilty on all charges. Mr. Torres hired a new attorney, who filed a motion for a new trial. The first claim in that motion was that the State had failed to disclose that Roberto had "pled guilty in juvenile court to attempted murder and aggravated battery in exchange for receiving five years['] probation" and that it was "inconceivable" that Roberto had not been promised something in exchange for such a lenient sentence. The motion was supported by affidavits from Mr. Torres's trial counsel, averring that they had repeatedly asked the State for the outcome of Roberto's juvenile case and were told that Roberto had received a sentence of probation. One of Mr. Torres's trial lawyers stated that the ASA told him, just before jury selection, that "documents reflecting [Roberto's] criminal record were available on the table of the jury room for our inspection" but that he "did not examine the records at that time" and was "not provided with a photocopy." It appears from the affidavits attached in support of Mr. Torres's motion for a new trial that his trial counsel

was still unaware, at the time they submitted those affidavits, that Roberto had in fact pled guilty only to aggravated battery and not to attempted murder. At the hearing on the motion, which the trial court denied, the ASA denied that there had been any deal with Roberto but, again, never advised the court or defense counsel that, contrary to the testimony elicited by the State at trial, Roberto had only pled guilty to aggravated battery.

¶ 29    The trial court merged a number of the offenses and sentenced Mr. Torres to 35 years in prison for attempted first degree murder while personally discharging a firearm (*id.* § 8-4(a); 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2010)) and 6 years in prison for aggravated discharge of a firearm in the direction of a vehicle that Mr. Torres knew or reasonably should have known was occupied by a person, to wit, Mr. Cintron (720 ILCS 5/24-1.2(a)(2) (West 2010)). The sentences were consecutive. Mr. Torres's motion to reconsider his sentences was denied and this appeal followed.

¶ 30    On November 9, 2017, the Office of the State Appellate Defender, which represents Mr. Torres on appeal, sought leave to file in this court an electronic supplemental record *instanter*. The State did not object, and on November 16, 2017, we allowed the motion. The supplemental record consists of a printout from case No. 11 JD 4268, the juvenile case against Roberto Vargas. This record makes it clear that the only crime Roberto pled guilty to was count VII, aggravated battery, and that all of the other charges, including the charge of attempted murder, were nol-prossed by the State.

¶ 31                                    II. JURISDICTION

¶ 32    Mr. Torres was sentenced on May 14, 2015, and timely filed his notice of appeal that same day. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Dec. 11, 2014), governing appeals from final judgments of conviction in criminal cases.

¶ 33                                    III. ANALYSIS
¶ 34                             A. Attempted Murder Conviction
¶ 35    We first consider Mr. Torres's claim, as it relates to his conviction for attempted murder, that Roberto gave false testimony about what he pled guilty to. At the outset, we reject the State's arguments that (1) we should not have granted Mr. Torres leave to supplement the appellate record in order to show us that the testimony was false and (2) even as supplemented, the record is not complete because it does not include Roberto's "rap sheet," making this claim more appropriate for a collateral proceeding.

¶ 36    The State's first argument fails for several reasons. First, the State failed to object when Mr. Torres sought to supplement the record on appeal. Second, the docket sheet from Roberto's juvenile case, which shows that the only offense Roberto actually pled guilty to was aggravated battery, is necessary to our consideration of Mr. Torres's claim that false testimony was used to convict him. See Ill. S. Ct. R. 329 (eff. July 1, 2017) (a supplemental record may be filed if the record is insufficient to fully and fairly present the questions raised on appeal). Third, our supreme court has made it clear that it is "well within" our authority to take judicial notice of court records in related cases. *In re N.G.*, 2018 IL 121939, ¶ 32.

¶ 37    The State's second argument also fails. It assumes that Roberto's "rap sheet" is the document that Mr. Torres's trial counsel referenced in the affidavit attached to Mr. Torres's motion for a new trial—the document he noted had been on the table of the jury room for "inspection," but which he had never looked at. The State also assumes that this document would have revealed that Roberto only pled guilty to aggravated battery. If all of this was true, and this document was in the record, it might support a claim of ineffective assistance of counsel on Mr. Torres's conviction for attempted first degree murder. Because we reverse that conviction on other grounds, there is no need to reach this issue. For reasons that we discuss later in this opinion, what Roberto pled guilty to could not have affected the jury's findings on any other charges. Thus, the record is not incomplete or inadequate because of the missing "rap sheet." We now turn to the merits of Mr. Torres's claim.

¶ 38    The State in this case directly solicited the false testimony from Roberto, asking him in a leading manner, "on June 20th, 2013, in case number 11 JD 4268, you pled guilty in Juvenile Court to attempt murder and aggravated battery; is that correct?" Then, during the jury instruction conference later that same day, defense counsel drew special attention to this testimony, expressing concern that the jury might "infer [Roberto's] guilty plea [was Mr. Torres]'s, especially where one of the key issues in the case [was Mr. Torres]'s intent on the attempt murder." The State did not, on either of these occasions, correct the record and make clear that Roberto had only pled guilty to aggravated battery.

¶ 39    Mr. Torres's argument is that the State's failure to correct Roberto's false testimony deprived him of due process of law. The State concedes that Roberto's testimony was inaccurate but takes the position that because Mr. Torres did not object at trial, it is Mr. Torres's burden to convince this court that the admission of this testimony rose to the level of plain error. The plain error doctrine allows a reviewing court to consider unpreserved claims of error only when the evidence is closely balanced or the error is so serious that it challenges the integrity of the judicial process. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 40    The State's premise—that Mr. Torres must show that admission of this false testimony rises to the level of plain error—is incorrect. Where, as here, the State elicits and then fails to correct testimony it is charged with knowing is false because it relates to a plea deal that the State made with its own witness, the defendant has no obligation to uncover the falsehood and object. *People v. Olinger*, 176 Ill. 2d 326, 348 (1997). Rather, "if there is any reasonable likelihood that the false testimony could have affected the jury's verdict," the defendant is entitled to a new trial. *Id.* at 349. The burden is on the State to correct the testimony or, having failed to do so, to show that the testimony's admission was harmless beyond a reasonable doubt. *Id.* at 348-49. This standard is applied by both the United States Supreme Court and our own supreme court when false testimony has been offered at trial regarding a deal the State has struck with a witness—a subject uniquely within the State's knowledge. See *Napue v. Illinois*, 360 U.S. 264, 270-72 (1959) (conviction reversed where a witness testified falsely that he received no consideration in return for his testimony and where such testimony "may have had an effect on the outcome of the trial"); *Giglio v. United States*, 405 U.S. 150, 152-55 (1972) (conviction reversed where witness testified falsely that he was not promised immunity in exchange for testimony); *Olinger*, 176 Ill. 2d at 345-47 (evidentiary hearing ordered on postconviction petition claim that prosecution witness failed to disclose promises made to him by the prosecution); *People v. Jimerson*, 166 Ill. 2d 211, 222-23, 230-31 (1995) (new trial ordered on a postconviction petition where the State elicited testimony from a witness that she

had not been promised anything, when in fact the State had promised her that the murder charge against her would be dropped). Like those cases, the false testimony here was about a deal the State had made with one of its own witnesses. The State allowed Roberto to plead guilty only to aggravated battery and dropped the attempted murder charge against him.

¶ 41 Our supreme court summarized the law on this point in *Lucas*:

"We have held that where the State's case includes perjured testimony, and the State knew, a ' "strict standard of materiality" ' applies, and a court of review must overturn the conviction 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' [Citation.] 'This standard is equivalent to the harmless error standard ***.' [Citation.] The strict standard of materiality applies even if the State did not solicit the false testimony, but rather left it to go uncorrected." *People v. Lucas*, 203 Ill. 2d 410, 422 (2002).

¶ 42 While it is not at all clear on this record that the prosecutor trying the case actually knew that Roberto's testimony was false, our supreme court has made clear that "knowledge on the part of any representative or agent of the prosecution is enough." *Olinger*, 176 Ill. 2d at 348. Thus, in *Olinger*, the court ruled that if the prosecutor's office knew that a State witness had worked out a multijurisdictional deal in exchange for his testimony, it was a due process violation to allow that witness to testify that he was only given immunity from prosecution on one charge, regardless of whether the prosecutor in the courtroom knew the full extent of the deal. *Id.* at 346-48; see also *Giglio*, 405 U.S. at 154 ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government.").

¶ 43 In *Olinger*, *Jimerson*, and *Lucas*, the defendants' claims that the State elicited false testimony were first raised in postconviction petitions. This case, however, is one of those rare situations in which the fact that trial testimony was false can be demonstrated on direct appeal because Mr. Torres was able to provide this court with the record of conviction in Roberto's juvenile case. Indeed, the State does not dispute that while Roberto testified that he pled guilty to attempted murder, he in fact pled guilty only to aggravated battery.

¶ 44 Since it is undisputed that the State elicited false testimony as to what Roberto pled guilty to, the only question remaining is whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." (Internal quotation marks omitted.) *Lucas*, 203 Ill. 2d at 422. In his brief, Mr. Torres focused on the possibility that this false testimony about what charges were dropped against Roberto might have "misled the jury to believe that Roberto had no motive to testify favorably for the State." In fact, the potential prejudice to Mr. Torres is far starker: because the jury was falsely told that Roberto pled guilty to attempted murder, the jury could have concluded that Mr. Torres must also be guilty of this offense. This would have eviscerated the only defense that Mr. Torres offered, which was that he had no specific intent to kill anyone. His trial counsel picked up on this at the jury instruction conference, when he asked for a special jury instruction because of his concern that the jury could "infer [Roberto's] guilty plea [was Mr. Torres]'s, especially where one of the key issues in the case [was Mr. Torres]'s intent on the attempt murder."

¶ 45 Mr. Torres's sole defense was that he lacked the specific intent to kill. The State was required to prove that specific intent beyond a reasonable doubt. *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001). Mr. Torres told the police that he intended to scare Mr. Lopez or

a relative, not to kill. This was supported by Roberto's testimony that his mother's instructions to the two of them were to scare Mr. Lopez or one of his relatives. The jury rejected this defense, and Mr. Torres does not suggest that the verdict cannot be supported on this record. But the jury's false belief that Roberto pled guilty to attempted murder absolutely could have contributed to the jury's finding that Mr. Torres was also guilty of attempted murder.

¶ 46 This was a very short trial; five witnesses were presented in the span of a single day. And Roberto was the only witness who was an accomplice to the crime. The State clearly elicited an answer from him about the nature of his plea that the prosecutor knew or should have known was false. The potential harm from this testimony was specifically brought up at the jury instruction conference where Mr. Torres's counsel expressed concern that the jury might infer that his client was also guilty of attempted murder. The State never corrected the false testimony it had elicited. We cannot assume this false answer was buried in a myriad of other details or witness testimony. On this record, we simply cannot conclude that the false testimony was harmless beyond a reasonable doubt.

¶ 47 The dissent suggests that the evidence here was so overwhelming that the false testimony could not have mattered. However, while the evidence was certainly undisputed that Mr. Torres shot Mr. Salgado, the evidence was very much disputed as to whether he intended to kill the occupant of the vehicle or only scare him.

¶ 48 The dissent's characterization of this defense as being "based on a single word" in Mr. Torres's confession is simply not correct. Throughout his statement to the police and throughout Roberto's and Jesenia's testimony, evidence was presented that the reason Mr. Torres fired two shots at Mr. Salgado, whom Mr. Torres thought was "Beto," was to scare him, never to kill him. The testimony was undisputed that the gun used did not belong to Mr. Torres but was thrust at him by Roberto with instructions from Linda to use it to scare Beto. While the dissent references Mr. Torres's "statement" that the gun "got stuck," implying that he would have continued to fire shots, this alleged statement was reported only by Jesenia. In his own statement, Mr. Torres said that after he shot at the driver twice, "he panicked and ran down the alley." The thrust of the defense's closing argument was that "there was an intent to scare, not the intent to kill." While the jury was not required to accept this argument, they were entitled to consider it, and there was certainly a "reasonable likelihood" that their incorrect belief that the man who was with Mr. Torres throughout this incident, Roberto Vargas, had pled guilty to attempted murder contributed to the guilty verdict.

¶ 49 The dissent also argues that *Olinger* and the other cases cited above do not apply here because there is no showing that the prosecutor deliberately suborned perjury or that Roberto had any motive to lie to the jury. However, as *Olinger* makes clear, it does not matter whether the prosecutor in the courtroom knew what Roberto pled guilty to; that prosecutor is charged with knowledge possessed by anyone in the office of the Cook County State's Attorney. *Olinger*, 176 Ill. 2d at 348. It also does not matter whether Roberto knew the import of what he was testifying to or why it could impact Mr. Torres's trial. As the United States Supreme Court has stated, whether by "negligence or design," false testimony from a prosecution witness about a deal between that witness and the government implicates due process concerns. *Giglio*, 405 U.S. at 154.

¶ 50 The dissent cites *People v. Redmond*, 265 Ill. App. 3d 292, 309 (1994), for the proposition that Mr. Torres must demonstrate by clear and convincing evidence that the false testimony he is complaining of was "willfully and purposefully falsely given." (Emphasis and internal

quotation marks omitted.) *Redmond*, which was decided several years *before* our supreme court decided *Olinger*, would not be controlling if it stood for a conflicting rule of law. However, it does not. *Redmond* has nothing to do with testimony by a witness regarding a deal between that witness and the government. In contrast to this case, *Olinger*, and the other cases cited above, *Redmond* involved a garden-variety claim that certain trial testimony was contradicted by other evidence. *Id.* at 308-09. It is in that context that the court in *Redmond* pointed out that a defendant has the burden of showing that the State knowingly used perjured testimony and that the testimony was "*willfully* and *purposefully* falsely given." (Emphases in original and internal quotation marks omitted.) *Id.* at 309.

¶ 51   In *Redmond*, this court rejected the defendant's argument that his lawyer cooperated with the State in a fraudulent scheme in which a police officer purportedly lied about where certain bullets had been recovered. *Id.* at 308-09. In *People v. Trimble*, 220 Ill. App. 3d 338, 346 (1991), which we relied on in *Redmond*, the defendant on appeal made a due process argument based on inconsistencies between a witness's pretrial statement and trial testimony. Neither case had anything to do with a prosecutorial decision to nol-pross charges or another deal between the prosecution and the witness.

¶ 52   *Olinger*, the other cases we cited above, and this case all deal with testimony from a prosecution witness that is not just undermined by other evidence at trial but is directly contradicted by information that is uniquely in the hands of the prosecutor. The prosecution is not responsible for ensuring the veracity of every witness it presents, but the prosecution is charged with knowledge as to the plea deals it makes with its own witnesses. And when those witnesses deny or misrepresent those deals on the stand, the defendant is entitled to a new trial if there is any reasonable likelihood that the false testimony affected the verdict.

¶ 53   The dissent also suggests that this false testimony did not matter because Roberto's testimony was not critical to the prosecution's case. However, the import of the false testimony is not whether it gave the jury a false reason to believe Roberto, but that it gave the jury a false understanding of what Roberto pled guilty to. It would not matter if Roberto had offered no testimony at all. The problem in this case was that the jury was falsely told that Roberto—the other participant in this crime—pled guilty to attempted murder. There is a real danger that this representation suggested to the jury that Mr. Torres, who actually fired the gun, should be convicted of that crime as well.

¶ 54   Mr. Torres's conviction for attempted murder must be reversed, and this case remanded for a new trial on that charge. We turn now to the arguments with respect to Mr. Torres's other conviction.

¶ 55                              B. Aggravated Discharge of a Weapon Conviction

¶ 56   In contrast to the attempted murder charge, it is clear on this record that Roberto's testimony did not impact the jury's finding that Mr. Torres was guilty of aggravated discharge of a firearm in the direction of a vehicle he knew or reasonably should have known was occupied by a person (720 ILCS 5/24-1.2(a)(2) (West 2010)). Although Mr. Torres urges us to find that Roberto's false testimony impaired defense counsel's ability to undermine Roberto's credibility, we are unpersuaded that this had any impact on the jury's finding him guilty of this second offense.

¶ 57   Roberto's credibility simply did not matter on the charge of aggravated discharge of a weapon. Mr. Torres acknowledged in his own statement that he fired the gun at the car where

Mr. Cintron was sitting, and all of the witnesses testified to this fact. Thus, even if this false testimony somehow enhanced the credibility of Roberto and his girlfriend, Jesenia, its admission was harmless beyond a reasonable doubt for purposes of Mr. Torres's conviction for aggravated discharge of a weapon.

¶ 58 Mr. Torres's only other argument for reversing his conviction for aggravated discharge is that this conviction violated the one-act, one-crime doctrine, which prohibits multiple convictions based upon the same physical act. See *People v. Kotero*, 2012 IL App (1st) 100951, ¶ 19. Following our reversal of Mr. Torres's conviction for attempted murder, however, there is only one conviction and therefore no one-act, one-crime issue. We decline to speculate on whether or how this issue might arise again on remand.

¶ 59                                C. Ineffective Assistance of Counsel

¶ 60 We also reject Mr. Torres's claim that his trial counsel was ineffective as a basis for overturning his conviction for aggravated discharge of a weapon. Claims of ineffective assistance of counsel are judged under the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). *People v. Dupree*, 2018 IL 122307, ¶ 44. Under the *Strickland* standard, a defendant must show that (1) "counsel's performance fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "Failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim." *People v. Banks*, 2016 IL App (1st) 131009, ¶ 123.

¶ 61 Mr. Torres claims that his trial counsel was deficient for failing to verify what Roberto actually pled guilty to. This apparently relates to the "rap sheet" that was not made part of the record, but which defense counsel said in an affidavit filed in support of a new trial was left on the table in the jury room for inspection. Mr. Torres also claims that counsel was deficient because of his "rambling" and "incoherent" closing argument. We may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong. *People v. Hale*, 2013 IL 113140, ¶ 17. The prejudice prong requires Mr. Torres to show that counsel's deficiency was so serious it deprived him of a fair trial. *People v. Smith*, 195 Ill. 2d 179, 188 (2000). We need not address any deficiency as it pertains to Mr. Torres's conviction for attempted murder, since we reverse that conviction on other grounds. It is clear to us that any possible prejudice from counsel's performance would be limited to that conviction; thus, we reject Mr. Torres's claim of ineffective assistance.

¶ 62 The only argument that Mr. Torres offers to demonstrate prejudice is that if the jury knew that the State had dropped the attempted murder charge, this might have undermined Roberto's and Jesenia's credibility and helped the jury to see that they each had a motive to testify favorably for the State. Mr. Torres does not offer any suggestion about what his trial counsel could have but failed to argue in his closing argument on any of these other charges. The evidence on all the aggravated battery charges was overwhelming. Mr. Torres has offered no defense (other than his argument under the one-act, one-crime doctrine) to any of those charges, either at trial or on appeal. The only defense that Mr. Torres has ever offered was that he had no intent to kill. Thus, Mr. Torres cannot make the showing of prejudice by *Strickland* on any of the remaining charges against him.

¶ 63                                    IV. CONCLUSION

¶ 64        We reverse Mr. Torres's conviction for attempted first degree murder and remand for a
new trial on that charge. We affirm his conviction for aggravated discharge of a firearm in the
direction of a vehicle occupied by a person.

¶ 65        Affirmed in part and reversed in part; cause remanded.

¶ 66        PRESIDING JUSTICE GRIFFIN, dissenting:

¶ 67        The jury in this case heard defendant's confession to the crime and the testimony of two
eyewitnesses, one of whom defendant shot twice, once in the chest and once in the right arm,
at point-blank range. Defendant's theory of the case was based on a single word contained in
his four-page confession: "scare." He asked the jury to believe that he intended to "scare" his
victim, not kill him. The jury rejected this argument. But the majority concludes that there was
a chance the jury believed defendant and convicted him anyway because Roberto Vargas
testified incorrectly that he pled guilty to attempted first degree murder (720 ILCS 5/8-4(a)
(West 2010)). The majority finds that the State "directly solicited" (see *supra* ¶ 38) perjured
testimony from Vargas and holds that it failed to prove harmless error. The majority grants
defendant a new trial.

¶ 68        I disagree with the majority's finding and with its decision to apply the harmless error
standard to this case, as opposed to plain error. A close reading of the majority opinion reveals
that it relaxed the forfeiture rule in order to review Vargas's testimony for harmless error. The
premise was that a defendant should be under no obligation to "uncover" and "object" to
perjured testimony that the State solicits from its own witness. *Supra* ¶ 40. This would make
good sense if there was any evidence in the record that the State solicited perjured testimony
from Vargas. There is no such evidence in the record, and the parties did not ask us to conduct
a harmless error analysis.

¶ 69        Based on the evidence presented in this case and defendant's claims of plain error and
ineffective assistance of counsel raised on appeal, I would affirm defendant's conviction for
attempted first degree murder while personally discharging a firearm (720 ILCS 5/8-4(a) (West
2010); 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West Supp. 2011)). I would then vacate defendant's
conviction and sentence for aggravated discharge of a firearm in the direction of a vehicle he
knew or reasonably should have known was occupied by Angel Cintron (720 ILCS 5/24-
1.2(a)(2) (West 2010)) because it violates the one-act, one-crime doctrine. In the following, I
discuss the overwhelming evidence of the crime presented at trial and the lack of any evidence
that the State directly solicited perjured testimony from Vargas or dropped his attempt murder
charge in exchange for his testimony at trial. I conclude with an explanation as to why
defendant's failure to preserve his argument for appeal should not have been excused.

¶ 70        Defendant confessed in writing to shooting Salgado. His confession was admitted into
evidence at trial, read aloud to the jury by Detective David Leuzzi, and given to the jury for
use during deliberations. Defendant essentially gave everything up in his confession: how the
plan to send a message to Ruben Lopez for failing to arrive in Chicago with a truck full of
heroin was cooked up, what his orders were from Linda Vargas ("Linda told [defendant] that
he had to shoot Ruben or scare his family"), and how he carried out those orders when he
"pointed the gun at the driver" and "shot at the driver twice." Defendant's words were brought
to life when Jose Salgado and Angel Cintron took the stand.

¶ 71        Salgado testified at trial that on October 2, 2011, defendant walked up to the driver's-side door of his car, and from a distance of just "two feet," pulled a gun and shot him twice in the chest and right arm. Salgado saw the "flash" from defendant's gun and he immediately felt a "burning sensation" in his chest. He tried to drive to his parent's house "just to say bye to them" because "he was going to die." Cintron, who sat in the front passenger seat, testified that defendant stood a mere "five feet" away when he discharged his gun into the car "two or three times." Luckily, Cintron took the wheel and managed to get Salgado to the hospital before he died.

¶ 72        The jury heard more evidence. Jesenia Carmona testified that defendant got into Linda's car after the shooting and said he "shot the dude in the head and the body" and that his gun "got stuck." The jury learned that Carmona was present in the car after the shooting because defendant confirmed the fact in his written confession: "Yesenia was sitting in the front passenger seat."

¶ 73        Defendant's theory of the case was that he intended to "scare" Salgado, not kill him. But the specific intent to kill can be inferred from conduct, and defendant's conduct spoke volumes. The specific intent to kill is a question of fact for the jury. *People v. Valentin*, 347 Ill. App. 3d 946, 951 (2004). It is seldom proven by direct evidence and, therefore, may be inferred from the acts committed and the surrounding circumstances, such as the character of the attack, use of a deadly weapon, and the severity of the injury. *Id.* Specific intent may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy a person's life. *People v. Winters*, 151 Ill. App. 3d 402, 405 (1986). For an attempted murder charge, courts consider the number of shots, the range, and the general target area in assessing the strength of intent evidence. *People v. Bryant*, 123 Ill. App. 3d 266, 274 (1984). We have even held that " '[t]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill.' " *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001) (quoting *People v. Thorns*, 62 Ill. App. 3d 1028, 1031 (1978)).

¶ 74        The jury could have easily inferred defendant's specific intent to kill from his conduct, and if that was not enough, the jury could have turned to defendant's statements that his gun "got stuck" after "he shot the dude in the head and the body." The evidence of defendant's guilt was overwhelming, and this was not a close case by any stretch of the imagination. But defendant's confession, his statements made after the shooting, and the testimony of the eyewitnesses speak to more than just the apparent imbalance of the evidence. They place Vargas's corroborating testimony in context.

¶ 75        The majority cites *Olinger* in its opinion, but in that case our supreme court made clear that the defendant was entitled to an evidentiary hearing to determine whether the State knowingly used perjured testimony against him at trial because the allegedly perjurious testimony was "critical to the State's case against defendant." *Olinger*, 176 Ill. 2d at 349. More specifically, the testimony "was the *only* evidence placing the murder weapon in defendant's hands," and the State's witness "provided the *only* evidence which attributed a motive to defendant for the killings." (Emphases in original.) *Id.* Vargas's testimony was not critical to the State's case. Frankly, Vargas corroborated defendant's confession and his plea testimony was not even used by the State as a basis for his guilt during closing argument.

¶ 76        More importantly, our supreme court in *Olinger* found that the defendant made a substantial showing that the State's witness committed perjury when he "framed his testimony"

- 13 -

so as to conceal his potentially "powerful motive to testify falsely" for the State: the witness told the jury that, in exchange for his testimony, the State agreed to drop burglary charges pending against him in a single jurisdiction when, in fact, there was evidence indicating that the defendant had received a multijurisdictional deal with authorities. *Id.* at 346-50. Critically, the court also found that the defendant "made a substantial showing that Illinois authorities knew of this multijurisdictional deal, but nonetheless allowed [the State witness's] false testimony to go uncorrected." *Id.* at 348. It explained that even though the prosecutor trying the case may not have known about the multijurisdictional deal, the evidence demonstrated that the "prosecutor's office" knew about the agreement and that was enough. *Id.* at 348-49 ("the prosecutor actually trying the case need not have known that the testimony was false; rather, knowledge on the part of any representative or agent of the prosecution is enough").

¶ 77    As support for its decision to charge the entire office with knowledge of the multijurisdictional deal in *Olinger*, our supreme court cited *Giglio v. United States*, 405 U.S. 150, 152-53 (1972). In that case, the acting prosecutor was not informed that a government witness had struck a deal with another prosecutor to provide testimony before the grand jury. At trial, the acting prosecutor stated that "[the witness] received no promises that he would not be indicted." *Id.* The United States Supreme Court held that "[a] promise made by one attorney must be attributed, for these purposes, to the government" and reversed the defendant's conviction because (1) the jury was entitled to know about the deal and (2) the "[g]overnment's case depended almost entirely on [the witness's] testimony." *Id.* at 154.

¶ 78    It is clear from *Olinger* and *Giglio* that a prosecutor's office cannot strike a deal with a witness to offer material testimony against a defendant at trial and later claim the acting prosecutor lacked personal knowledge of the agreement when the witness commits perjury on the stand. Under such circumstances, the prosecutor is charged with the requisite knowledge and the conviction violates the guarantees of due process. But the facts that triggered the operation of this principle in *Olinger* and *Giglio* are wholly absent from the record in this case.

¶ 79    There is no evidence that the State dropped Vargas's attempted murder charge in exchange for his testimony at trial. Surely, Vargas got a "deal" in the colloquial sense. After all, he received a sentence of five years' probation for his involvement in a heinous crime. But there was no evidence that Vargas's testimony was the consideration for the dropped charge. Vargas pled guilty more than a year before defendant proceeded to trial. By that time, assuming the State had given Vargas the proverbial carrot, it is doubtful the State could have used the stick. Moreover, Vargas entered his plea of guilty to aggravated battery (720 ILCS 5/12-3.05(a) (West Supp. 2011)) after a Rule 402 conference (Ill. S. Ct. R. 402 (eff. July 1, 1997)) (402 Conference), where the State asked for jail time and did not receive it from the judge. If there was a deal, it may not have been fair to proceed to a 402 Conference. Finally, the State's case did not depend on Vargas's testimony.

¶ 80    Accordingly, the principle outlined in *Olinger* and *Giglio* does not operate in this case. But even if it did, the State would be charged with knowledge of a factual inaccuracy, not perjury. There is no evidence of perjury in this case, but before turning to that discussion, I find it necessary to quickly address two additional questions asked of Vargas at trial.

¶ 81    During the direct examination of Vargas about his guilty plea in juvenile court, the prosecutor asked: "[w]ere any threats or promises made to you prior to your testimony today?" Vargas answered, "No." The prosecutor continued: "[w]ere any threats or promises made to you prior to your pleading guilty in [the juvenile] case?" Vargas again answered, "No." The

- 14 -

majority makes no mention of this exchange in its opinion. By the majority's reasoning, this too would constitute a due process violation and perhaps, may better fit the facts and circumstances present *Olinger* and *Giglio*. But again, the record contains no evidence of a deal or perjury, the State's case did not depend on Vargas's testimony and this specific testimony did not relate to defendant's specific intent to kill. Accordingly, even if the majority had addressed this exchange at trial, it would not be reversible.

¶ 82   To prove the State's knowing use of perjured testimony, the defendant must show by clear, convincing, and satisfactory evidence that the testimony was not merely false, but " '*willfully* and *purposefully* falsely given.' " (Emphases in original.) *People v. Redmond*, 265 Ill. App. 3d 292, 309 (1994) (quoting *People v. Trimble*, 220 Ill. App. 3d 338, 346 (1991)). A witness commits perjury if he or she "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

¶ 83   There is no evidence of perjury in the record. Defendant tried to argue on appeal that Vargas struck a deal with the State and had something to gain from his testimony, but theory fell flat when (1) the State denied the existence of any such agreement and (2) the transcript of Vargas's plea proceeding showed that it was accepted after a 402 Conference. The State could have dismissed Vargas's attempted murder charge for any number of reasons; to show that it was dismissed pursuant to an agreement to cooperate, there must be evidence to that effect and in this record, there is none.

¶ 84   There is also no evidence that the State intentionally solicited Vargas's testimony. In fact, defendant did not argue that the State intentionally solicited Vargas's testimony. Rather, defendant made clear in his opening brief that the State asked an "inaccurately worded question" and failed to correct the answer given. The State relied on this position in its response brief and advanced no argument in defense of a claim that it suborned perjury. "While it is true that the prosecutor's question is partially misworded, there is no evidence, and defendant does not allege, that this misstatement was intentional on the part of the prosecutor or that Vargas intentionally falsely relayed an improper conviction."

¶ 85   The only conclusion to be drawn from the record in this case, and we are bound by the record, is that the State asked an "inaccurately worded question" and failed to correct the answer given. To arrive at a different conclusion here, the majority must find its own facts and does so, on direct appeal, without any response from the State in its own defense. See *Olinger*, 176 Ill. 2d at 371 (remanding the case to the trial court for an evidentiary hearing on the issue of whether the State knowingly used perjured testimony against the defendant at trial).

¶ 86   Defendant conceded in his opening brief that he failed to preserve his argument for appeal ("Torres acknowledges that this issue was not preserved for review."). But the majority relaxes the forfeiture rule and reverses defendant's conviction because the State failed to prove harmless error beyond a reasonable doubt. I certainly would agree with the majority that if the State directly solicits perjury from its own witness and a defendant does not pick up on it at trial, then the forfeiture rule should be relaxed, and we should excuse the defendant's failure to object to the perjured testimony at trial. The State's knowing use of perjured testimony should never be condoned; when it is proven, it should be strongly condemned.

¶ 87   But in this case, there is no evidence, or even an allegation of perjury, and we have a defense attorney whom the parties do not dispute was given access to Vargas's criminal background before trial and simply did not look at the document. Defense counsel even

admitted that he did not look at the document: "[o]n the eve of trial, just prior to jury selection, I was informed by [the prosecutor] that documents reflecting Vargas' criminal record were available on the table of the jury room for our inspection" but "I did not examine the records at that time, and I was not provided with a photocopy."

¶ 88    As the majority points out, defense counsel proffered a "[f]ederal instruction" to the trial court during the jury instructions conference and argued that it "should be used in this case so that the jury does not infer Mr. Vargas' guilty plea is the defendant's." But when defense counsel proffered the instruction, he was still unaware that Vargas's testimony was factually inaccurate. The trial court denied defense counsel's request, but gave Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2014), in its place: "[w]hen a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

¶ 89    Given the truly unique circumstances of this case, the majority's decision to review this case for harmless error, as opposed to plain error, can be reasonably interpreted as a declaration that even if a defendant knows the State asked its witness an "inaccurately worded question" and received a factually inaccurate answer, he or she would have no obligation to object at trial or raise the objection in a posttrial motion. In other words, the State on appeal must always prove harmless error beyond a reasonable doubt to protect the jury's verdict when it incorrectly elicits inaccurate testimony from its own witness at trial. I would find that the record before us fails to provide a sufficient factual predicate upon which to base the determination that the State always bears such a burden on appeal.

¶ 90    Given the state of the record, and the issues raised and argued by the parties on appeal, I would affirm defendant's conviction for attempted first degree murder while personally discharging a firearm (720 ILCS 5/8-4(a) (West 2010); 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West Supp. 2011)). Defendant cannot demonstrate first-prong plain error, and he cannot demonstrate prejudice such that his claim of ineffective assistance of counsel must fail. See *People v. White*, 2011 IL 109689, ¶ 133 (explaining that first-prong plain error review is functionally similar to the prejudice prong of the *Strickland* test (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984))). Defendant's claim of second-prong plain error fails outright because he has failed to show that the State's failure to correct Vargas's testimony was a clear and obvious error that falls into the unique category of nonstructural second-prong plain errors established by our supreme court. *In re Samantha V.*, 234 Ill. 2d 359, 378-79 (2009); *People v. Walker*, 232 Ill. 2d 113, 131 (2009).

¶ 91    This was a heinous crime perpetrated against an innocent victim. Jose Salgado was not involved in the drug trade, but he will forever be one of its victims. All because defendant followed orders to shoot a drug trafficker and shot the wrong person.

¶ 92    I respectfully dissent.